THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES A. NEALE,<br><br>                  Plaintiff,<br><br>        v.<br><br>FRANCIS G. SUAREZ; ONE EYED<br>JACK'S BUSINESS DEVELOPMENT, LLC,<br><br>                  Defendants. | Case No. C09-0770-JCC<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

This matter comes before the Court on a three-day bench trial. The civil action involves claims of federal and state securities fraud, violations of the Washington Consumer Protection Act, fraud in the inducement, negligent misrepresentation, unjust enrichment, and quantum meruit. Plaintiff James A. Neale was a frequent patron of the Highway 9 Casino who inherited a sum of money. Neale alleges that Defendant Francis G. Suarez—majority member of Defendant One Eyed Jack's Business Development, LLC, and owner of the Highway 9 Casino—summoned Neale to Suarez's office where Suarez promised Neale a $90,000 annual income stream within two years of Neale investing $150,000 into the LLC and the casino. Neale also alleges that he was an unsophisticated investor who was not given access to vital financial information. After investing $150,000 into the LLC and the casino, Neale did not receive the allegedly promised $90,000 annual return, and the LLC ceased operations. Having

ORDER, C09-0770-JCC
PAGE - 1

heard the evidence and considered the record, the Court finds and rules as follows.[1]

I.       FINDINGS OF FACT

   **A.       Background**

   1.       The One Eyed Jack's Business Development, LLC, was a Washington state limited-liability company licensed and authorized by the Washington State Gambling Commission to conduct gambling activities in the state of Washington.

   2.       Defendant Francis Suarez was the majority member of the LLC.

   3.       The LLC owned and operated a gambling casino known as the Highway 9 Casino in Lake Stevens, Washington.

   4.       Plaintiff James Neale was a frequent gambler at the Highway 9 Casino. Neale gambled nearly every day of the week.

   5.       Neale boasted to many people inside the Highway 9 Casino that he had received a substantial amount of money through an inheritance and that he was interested in investing in a casino.

   6.       Casino employees told Suarez that Neale was interested in investing in the Highway 9 Casino.

   7.       Suarez asked a casino employee to invite Neale to Suarez's office.

   8.       Neale met with Suarez on August 3, 2005. Neale informed Suarez that Neale wanted to invest in the casino. Suarez gave Neale a profit-and-loss statement for the first seven months of 2005 and a copy of the Highway 9 Casino's business plan.

   9.       Neale's expression of interest in investing in the casino was based on Neale's personal desire to become an owner of a casino. It was not based on any publications or statements issued by the LLC or Suarez, any business plan or prospectus prepared by the

   _____

   [1] The Court grants Defendants' motions to correct the exhibit list or, alternatively, admit into evidence certain exhibits listed therein (Dkt. Nos. 101, 104).

ORDER, C09-0770-JCC
PAGE - 2

1    casino for distribution to the general public, or any registration statement prepared under the

2    federal securities laws.

3          10.     Neale did not make a decision to purchase a portion of a membership interest in

4    the LLC from Suarez at the first meeting on August 3, 2005. Neale returned voluntarily

5    without request from Suarez on August 12, 2005, nine days after the first meeting. At the

6    August 12 meeting, Neale negotiated with Suarez over the price of a 4 percent membership

7    interest in the LLC. Suarez lowered the price from $15,000 per percentage point to $12,500 per

8    percentage point. As part of the negotiations, Neale and Suarez understood that Neale would

9    build and  maintain a website for the casino, visit other casinos to get ideas on changes that

10   could be made by the Highway 9 Casino's operations, and generally inform his Lake Stevens

11   community about the casino.

12         11.     On August 12, 2005, Neale paid Suarez $50,000 in the form of a check made

13   payable to "Francis Suarez" for purposes of buying shares in the LLC. Neale and Suarez

14   signed a purchase agreement that summarized the terms and conditions of the investment.

15         12.     On September 20, 2005, Neale returned for a third meeting with Suarez at

16   which Neale tendered a second check for $100,000 to purchase an additional 8 percent interest

17   in the LLC. Neale and Suarez signed a second purchase agreement.

18         13.     Suarez did not promise Neale that he would receive a $90,000 annual income

19   stream as a result of the $150,000 investment.

20         14.     Under the terms of the LLC Agreement, in order for Neale to have received a

21   $90,000 payout in 2007 as a 12 percent member, the LLC needed to make a profit of at least

22   $750,000 if no money was reinvested into the casino and $937,500 if the proposed 20 percent

23   of net profit was reinvested. Having taken a loss of $400,000 in 2004, the LLC would have

24   needed to realize an increase in net profit well over $1,000,000—an unrealistic figure

25   unreasonably expected by Neale.

26         15.     Any expectation over potential future profitability in September 2005 did not,

ORDER, C09-0770-JCC
PAGE - 3

and likely could not, account for the negative financial impact on the Highway 9 Casino of the statewide indoor smoking ban passed in November 2005 and the state's decision regarding slot machines at certain casinos.

16.     Neither the smoking ban nor the slot-machine bar was applicable to casinos owned and operated by Native American tribes on tribal lands. The competition in these conditions negatively affected the Highway 9 Casino's gross revenues. Suarez was not responsible for these actions.

17.     Neale had ample opportunity to investigate information concerning the LLC and its business operations prior to purchasing his 12 percent interest.

18.     After selling to Neale 12 percent of his interest in the LLC, Suarez began informing relevant state agencies of the investment and ownership.

19.     As of December 21, 2005, the Washington State Gambling Commission had approved Neale as a member of the LLC.

20.     Efforts to have the LLC formally vote on making Neale a member of the LLC were delayed due to legal claims made against Neale and the LLC as a result of a business advertising agreement with Prime West, Inc. Neale agreed to the delayed vote as a strategy in the Prime West dispute.

21.     Plaintiff held himself out as the owner of the casino in several, if not all, transactions inside and outside the casino, including his negotiations with Prime West, Inc. Neale actively participated in the profit-making activities of the LLC as a partner and owner. Neale provide complimentary meal cards as the owner. Neale investigated competing casinos' operations and provided feedback and advice to change or add games to the Highway 9 Casino as an owner.

22.     Witness testimony confirms that Suarez did not remove money from the Highway 9 Casino; instead, Suarez repeatedly invested money in the casino to keep it afloat.

23.     Suarez paid less than Neale per percentage for his ownership interest in the LLC

largely because Suarez also assumed certain personal guarantees valued at $1,800,000 for rent and other expenses related to the business operations of the LLC. Neale did not assume any personal guarantees as part of his purchase.

24.     Neale repeatedly requested and was given financial data about the profit and loss status of the casino immediately after becoming an owner. Neale regularly requested and was given the master game reports, which informed Neale how each card table was performing in its revenues. At Neale's request, casino employees gave Neale financial statements throughout 2005 and 2006. These statements informed a reasonable owner and investor of the financial status of the casino and its profitability potential.

25.     Prior to September 20, 2008, Neale was sufficiently informed of the risk that he was not going to profit from his investment and could have discovered all facts giving rise to his complaint, if they existed at all.

26.     The LLC formally voted to make Neale a member on July 24, 2009. The vote ratified the earlier sale of the membership interest to Neale and his having become a 12 percent owner. Any delay in the formal membership vote was caused by Neale in agreement with the Suarez and the LLC. There is no allegation that the LLC distributed profits during the intervening time, and Neale was therefore not deprived of any profits during that time.

27.     Due to its inability to produce profits, in August 2009 the LLC voted to cease business operations.

**B.     Plaintiff Neale's Credibility.**

1.     Neale was not a credible witness.

2.     Neale's testimony and court submissions attempt to show that Neale is an unsophisticated person who cannot understand basic financial documents and who was easily fooled.

3.     Yet Neale demonstrated the capacity to learn card games and other complex skills through researching and studying information provided on the Internet. Neale studied

ORDER, C09-0770-JCC
PAGE - 5

1    computers on the Internet and at age nineteen began building his own computers.

2    　　　4.    Neale studied and became proficient in various complex card games, knowing

3    and using information about the mathematical odds and strategies to win those games. Neale

4    was so proficient at Pai Gow that he successfully played three hands at one time, sometimes

5    betting $100 per hand. Neale also played poker against individual players.

6    　　　5.    Carol Henry, a casino employee, testified that Neal was a disciplined,

7    experienced gambler, with money-management skills. Henry testified that Neale was

8    knowledgeable about the business of gambling.

9    　　　6.    Neale reviewed financial statements and game reports, and he researched other

10   games and casinos, conferring with casino management about new gaming opportunities.

11   　　　7.    Suarez testified that Neale was much more sophisticated than he appeared at

12   trial, whereby Suarez accused Neale of falsely portraying himself at trial as inexperienced and

13   naïve. The Court finds Suarez credible on this issue.

14   　　　8.    David Sauer, formerly of Prime West, Inc., testified that Neale was an

15   informed, social, motivated, and proactive person. Sauer testified that nothing about Neale's

16   presentation during their advertising meetings indicated that Neale was an unsophisticated

17   business person.

18   　　　9.    Neale's testimony was inconsistent with the testimony of several witnesses.

19   During his deposition, Neale testified that he was not given financial information about the

20   games at the casino, yet Henry testified that she gave Neale financial documents at Neale's

21   repeated request.

22   　　　10.    Neale testified that he received certain business cards from the casino that

23   contained his personal e-mail address. But a casino employee testified that the casino would

24   not have produced such business cards that used Neale's personal, rather than his business, e-

25   mail address.

26   　　　11.    Neale's claim that Suarez promised Neale a $90,000 income stream within two

ORDER, C09-0770-JCC
PAGE - 6

1    years of investing $150,000 into the casino is not credible. The alleged promise is not

2    contained in any signed document. On this subject, the Court finds credible Suarez's testimony

3    denying that he made such a promise.

4    II.    CONCLUSIONS OF LAW

5          1.    Plaintiff Neale bears the burden of proof in each of his causes of action. *Zucco*

6    *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (federal securities);

7    *Schnall v. AT&T Wireless Servs., Inc.*, 225 P.3d 929, 938 (Wash. 2010) (Consumer Protection

8    Act); *Zabka v. Bank of Am. Corp.*, 127 P.3d 722, 723 (Wash. Ct. App. 2005) (negligent

9    misrepresentation); *Guarino v. Interactive Objects, Inc.*, 86 P.3d 1175, 1191 (Wash. Ct. App.

10   2004) (fraud); *Shinn v. Thrust IV, Inc.*, 786 P.2d 285, 298 (Wash. Ct. App. 1990) (state

11   securities); *Hopkins v. Anderson*, 502 P.2d 473, 476 (Wash. Ct. App. 1972) (quantum meruit);

12   *Golob v. George S. May Int'l Co.*, 468 P.2d 707, 713 (Wash. Ct. App. 1970) (unjust

13   enrichment); *see also Kirkham v. Smith*, 23 P.3d 10, 13 (Wash. Ct. App. 2001) ("It is well

14   established in Washington that the standard of proof in civil fraud cases is clear, cogent, and

15   convincing evidence.")

16         2.    Neale's claims rely on his disputed assertion that Suarez approached him for an

17   investment, promised Neale a $90,000 annual income stream in two years on a $150,000

18   investment, and withheld vital financial information from Neale.

19         3.    Because the Court finds Neale not credible and finds that Suarez did not

20   approach Neale about the investment, did not promise a $90,000 income stream, and did not

21   withhold vital financial information, the Court concludes that Neale has not met his burden of

22   proving any of his causes of action.

23         4.    Moreover, even if Suarez had promised Neale a $90,000 annual income stream,

24   Neale's causes of action—except the Washington Consumer Protection Act claim—must be

25   dismissed because Neale did not bring those claims within the applicable statute of limitations,

26   even applying the "discovery rule." *See* Wash. Rev. Code § 21.20.430(4)(b) (three years for

ORDER, C09-0770-JCC
PAGE - 7

1    state securities); *id.* § 4.16.080(4) (three years for fraud, unjust enrichment, and quantum

2    meruit); *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1790 (2010) (two years for federal

3    securities); *Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 739 (Wash. Ct. App. 2000) (three

4    years for negligent misrepresentation). Neale filed his lawsuit on June 3, 2009, almost four

5    years after Neale invested in the LLC.

6            5.      The Court disagrees with Neale that he was unable to reasonably discover all

7    the facts necessary to establish his causes of action within the statute of limitations. Neale

8    emphasizes his inability to discover facts about Suarez's scienter until at least two years after

9    the initial transaction because it was at that point that Neale did not receive the first payment of

10   his supposedly promised $90,000 annual income stream. *See Merck*, 130 S. Ct. at 1796. Yet

11   reasonable diligence—a basic financial calculation—would have immediately shown the near

12   impossibility that the casino would earn profits of at least $750,000 after sustaining a $400,000

13   loss. And the level of diligence needed to conclude that the profits would not materialize was

14   reduced with each passing day that Neale had access to the financial records of the casino.

15   Although "[a]n incorrect prediction about a firm's future earnings, by itself, does not

16   automatically tell us whether the speaker deliberately lied or just made an innocent (and

17   therefore nonactionable) error," the analysis is "context specific." *Id.* at 1797. In these

18   circumstances, with substantial financial losses already realized, a promise of $90,000 annually

19   could not reasonably be interpreted as simply an incorrect prediction; it would have

20   immediately indicated that Suarez was misleading Neale. *See also id.* at 1798 ("In determining

21   the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and

22   'storm warnings' may be useful to the extent that they identify a time when the facts would

23   have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period

24   does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff

25   would have discovered 'the facts constituting the violation,' including scienter—irrespective of

26   whether the actual plaintiff undertook a reasonably diligent investigation.").

ORDER, C09-0770-JCC
PAGE - 8

6.      Similarly, the Court disagrees with Neale that the "revelation" at trial that Suarez assumed personal guarantees valued at $1,800,000 shows that Neale could not have diligently discovered scienter before trial. The personal guarantees do not demonstrate fraud; they explain why Suarez paid a lower price per percentage of shares than Neale paid. Nor is it clear why Neale, as an owner, would have been unable to learn about those personal guarantees long before he filed his action.

7.      The same conclusions regarding Neale's knowledge of sufficient facts apply equally to the causes of action for fraud in the inducement and negligent misrepresentation.

8.      Additionally, Washington law does not require proof of scienter in its securities-fraud claims. *Kittilson v. Ford*, 608 P.2d 264, 266 (Wash. 1980). Accordingly, any delay in discovery of facts showing scienter is inapplicable to that cause of action. The Court likewise concludes that Neale's sophistication was more than sufficient to understand the financial position of the casino before he invested—not once, but twice—in its operations. *Cf. August v. U.S. Bancorp*, 190 P.3d 86, 95 (Wash. Ct. App. 2008). And his understanding could only improve after Neale received further financial information upon his requests for documents from casino employees. Neale and Suarez did not maintain a fiduciary relationship giving rise to reliance on any expert advice.

9.      Even if Suarez misled Neale about the possibility of a $90,000 annual income stream, which the Court does not believe, the conduct would not result in a violation of Washington's Consumer Protection Act. The act requires that a plaintiff prove, among other things, an impact on the public interest. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). The Court considers several factors, depending on the context in which the alleged acts were committed, to determine whether the public interest is at issue. *Id.* at 537–38. Having considered the factors, the Court concludes that there is insufficient evidence to establish that the public interest would be impacted. Most importantly, there is no evidence that Suarez's acts were part of a pattern or generalized course of conduct.

1   *See id.* at 538. The act essentially involved a single transaction involving one consumer; there

2   is no evidence of a real and substantial potential for repetitive conduct. Accordingly, Neale

3   cannot maintain his Consumer Protection Act claim.[2]

4        10.    Suarez was not unjustly enriched by the sale to Neale, and there is an express

5   contract between the parties. *See Macdonald v. Hayner*, 715 P.2d 519, 522 (Wash. Ct. App.

6   1986). Accordingly, Neale cannot maintain a claim for unjust enrichment.

7        11.    "Quantum meruit is an appropriate remedy where substantial change not within

8   contemplation of the contracting parties occurs with a resulting benefit to one party and

9   expense to the other." *Id.* There is no evidence of a substantial change not within the

10  contemplation of the parties that resulted in the benefit to Suarez and an expense to Neale.

11  III.   CONCLUSION

12       On the basis of the Court's findings of fact and conclusions of law, the Court concludes

13  that Plaintiff Neale has failed to meet his burden of proof with regard to all causes of action.

14  Accordingly, the Court will enter judgment in favor of Defendants in its entirety.

15       DATED this 15th day of February 2011.

16

17

18  _____

19  John C. Coughenour
    UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25  _____

26       [2] Neale does not alleges a per se public-interest impact. *See Hangman Ridge*, 719 P.3d
    at 538.

ORDER, C09-0770-JCC
PAGE - 10